Argued and submitted April 3, reargued December 3, 1979
reversed and remanded January 22, petition for rehearing
denied February 20, separate opinion on denial of petition
for review February 25, 1980 (288 Or 621, 605 P2d 690)

## STATE OF OREGON,
*Respondent,*

*v.*

## NANCY LEE SCHARF,
*Petitioner.*

## (TC   T-82694, CA 10121, SC 25855)

605 P2d 690

Mark Irick, of Hayter, Shetterly, Noble & Weiser, Dallas, argued the cause on December 3, 1979, for petitioner. Philip Hayter argued the cause on April 3, 1979, and filed a brief for petitioner.

Robert C. Cannon, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were James A. Redden, Attorney General, Al J. Laue, Solicitor General, and Donald L. Paillette, Assistant Attorney General.

LINDE, J.

Denecke, C.J., dissenting.

**LINDE, J.**

Convicted of driving under the influence of intoxicants (DUII), ORS 487.540, defendant appealed on the ground that the trial court admitted evidence of a chemical test of her breath that was administered after her arrest and after she was denied permission to telephone her attorney for advice. The Court of Appeals affirmed the conviction by an equally divided court, 36 Or App 345, 585 P2d 23 (1978), and we allowed review. The issue to be decided is whether the prosecution in a DUII case may rely on a defendant's assent to undergoing such a breath test when defendant submitted to the test only after demanding and being denied an opportunity to seek advice. We hold that under such circumstances the test results are not obtained with the defendant's voluntary and informed assent as contemplated by law and therefore reverse.

The issue arises from simple and undisputed facts. A state police officer stopped defendant's car and decided to arrest her for driving under the influence of intoxicants. The officer informed her that she had the right to remain silent, the right to consult an attorney and to have the attorney present before being questioned, if she wished, and the right to terminate questioning at any time. She asked to telephone an attorney and was told that she could do so at the police station. Upon arrival at the station, the officer advised defendant of her choice to take or refuse a "breathalizer" test and asked whether she consented to the test. Defendant repeated her requests for permission to call her attorney before deciding whether to take the test. Her requests were denied. Ultimately she submitted to the test, the results of which were later used, over her objection, to convict her of the offense.

As has become characteristic of criminal cases in recent years, the parties couch much of their argument in terms of federal constitutional guarantees, made applicable to the states by the 14th amendment. This carries into our present problem such issues as

whether the refusal to let defendant call her attorney violated her rights under the 6th amendment, and if so, whether it led to the kind of self-incriminatory consequences that must be suppressed as a result of the denial of access to counsel, or whether the breathalizer test is the kind of search to which counsel's advice is irrelevant and which may be imposed without violating either the 4th, 5th, or 6th amendments.[1] Before addressing such federal issues, however, a court's responsibility is first to decide the effect of the state's own laws, because if the state provides what defendant claims, it does not deprive her of the due process commanded by the 14th amendment. Conversely, a procedure not forbidden by the United States Constitution is not by that fact "authorized" in the absence of contrary state law, for the Constitution only limits the actions of state officials; authority to take these actions must be found in state law. *State v. Sims,* 287 Or 349, 353 n. 1, 599 P2d 461 (1979); *State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979); *State v. Smyth,* 286 Or 293, 593 P2d 1166 (1979); *State v. Scurlock,* 286 Or 277, 593 P2d 1159 (1979); *State v. Heintz,* 286 Or 239, 255, 257-258, 594 P2d 385 (1979) (concurring opinion); *State v. Greene,* 285 Or 337, 349, 591 P2d 1362 (1979) (concurring opinion); *State v. Flores,* 280 Or 273, 279, 570 P2d 965 (1977); *Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 570 P2d 52 (1977); *State v. Ivory,* 278 Or 499, 503, 564 P2d 1039

---

[1] U S Const, amend IV:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause , supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

U S Const, amend V:

"No person shall . . . be compelled in any criminal case to be a witness against himself, . . ."

U S Const, amend VI:

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

(1977); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *State v. Florance,* 270 Or 169, 180-187, 527 P2d 1202 (1974); *State v. Brown,* 262 Or 442, 453, 497 P2d 1191 (1972). If the state law is determined to be adverse to defendant, of course the federal issues remain to be decided. But the court will not needlessly interpret state law in a manner that would reach an unconstitutional result. *State v. Smyth, supra; State v. Harmon,* 225 Or 571, 577, 358 P2d 1048 (1961), and cases there cited.

When the issues are examined in this order, the result need not be derived from a constitutional "right to counsel." The question, rather, is whether there were valid grounds for denying Mrs. Scharf's request to make the telephone call during the period preceding the administration of the breathalizer test, and if not, what effect an improper denial has on the prosecution's right to use the test results against her.

The state does not deny, in principle, that Mrs. Scharf was entitled to call an attorney at some point following her arrest. The officer correctly told her so at the time of the arrest. As we have recently stated, nothing in Oregon law authorizes officers to hold an arrested person incommunicado beyond the immediate necessities of the arrest and the circumstances of custody itself.[2] The state does not claim that any such practical obstacles made it necessary to prevent or delay Mrs. Scharf's telephone call. Nor is there any

---

[2]

"It is not disputed that an arrested person has a right to have access to counsel when taken into custody and thereafter, subject only to the practical necessities of custody that may temporarily prevent immediate communication with counsel. We know nothing in Oregon law, nor did counsel for the state when asked, that would authorize the police to prevent or delay communication between an arrested person and a lawyer who is, or who is asked to become, that person's attorney. Certainly nothing of the kind follows from the simple fact of an arrest.[4] . . ."

*State v. Haynes,* 288 Or 59, 70-71, 602 P2d 272 (1979). Footnote 4 quoted the American Law Institute's Model Code of Pre-Arraignment Procedure, section 140.7 (1975).

contention that a telephone call would unduly delay the test.[3] If a person who insists on obtaining advice before making a choice unsuccessfully attempts to do so and the officer has reason for concern that the delay will make an eventual test unusable, the officer might at that time tell the arrested person that he will regard any further delay in making the choice as a refusal and report it as such to the Division of Motor Vehicles under ORS 487.805(2). *Cf. Capretta v. Motor Vehicles Div.*, 29 Or App 241, 562 P2d 1236 (1977) (license revocation). Rather, Mrs. Scharf was prevented from using the telephone specifically in order to compel her to choose whether to submit to the breathalizer test before making the call and to deprive her of legal advice on that choice. But it is not and cannot seriously be contended that depriving an arrested person of legal advice is in itself an authorized reason for preventing her to make a telephone call.

Instead the state relies on the contention that administration of the breath test is a civil rather than a criminal procedure. That might be true if it were limited to determining whether the driver's license should be suspended or revoked. *See Burbage v. Dept. of Motor Vehicles,* 252 Or 486, 450 P2d 775 (1969); *Stratikos v. Dept. of Motor Vehicles,* 4 Or App 313, 477 P2d 237, 478 P2d 654 (1971).[4] But we have held that a

---

[3] Regulations require a 15 minute period of observation before the test is administered. OAR 333-13-020 (1972). A longer delay does not necessarily vitiate the test results.

[4] *But see Prideaux v. State Dept. of Public Safety,* 310 Minn 405, 247 NW2d 385 (1976):

"The license revocation proceeding thus becomes an arm of the prosecutor in his attempt to gather evidence against the accused for use in criminal prosecution. Moreover, it is used as a means of obtaining evidence *at the time of arrest or detention for suspicion of driving under the influence.* Only *after* the driver makes his decision regarding the test does the proceeding divide clearly into its civil and criminal aspects—civil, if testing is refused; criminal, if testing is consented to; . . . Under these circumstances, we cannot see why evidence gathering for prosecution for driving under the influence using implied-consent
*(Continued on following page)*

DUII charge is a criminal prosecution. *Brown v. Multnomah County Dist. Ct., supra.*

We also hold that when the state's officers have deliberately compelled a person to decide on submitting to the breathalizer test without the requested opportunity to seek advice, the state did not obtain the test results with the person's consent as provided by law.

The Legislative Assembly has left the decision whether or not to submit to a chemical test of his or her breath to the person arrested for driving under the influence of intoxicants. It has done so in the roundabout way of first creating the statutory fiction of an "implied consent" and then providing that the arrested person may refuse to take the test at the cost of facing a probable 120-day suspension of his or her driver's license. ORS 487.805.[5] The statute provides that the officer is to "request" submission to the test, not order it. If the driver objects, the request is to be followed by an explanation of the consequences of a refusal for the

---

*(Continued from previous page)*
procedures is any less subject to constitutional scrutiny than other evidence-gathering procedures such as searches, use of informers, or custodial interrogation." (Emphasis in original.)

247 NW2d at 388-389.

[5] ORS 487.805:

"(1) Any person who operates a motor vehicle upon the highways of this state shall be deemed to have given consent, subject to ORS 487.805 to 487.815 and 487.825 to 487.835, to a chemical test of his breath for the purpose of determining the alcoholic content of his blood if arrested for driving a motor vehicle while under the influence of intoxicants in violation of ORS 487.540 or of a municipal ordinance. . . .

"(2) If a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 487.540 or of a municipal ordinance, refuses the request of a police officer to submit to a chemical test of his breath as provided in subsection (1) of this section, and if the person has been informed of the consequences of such refusal as provided by ORS 482.540 to 482.560 and of his rights as provided in ORS 487.810, no test shall be given, but the police officer shall prepare a sworn report of the refusal and cause it to be delivered to the division. . . ."

[457]

driver's license, ORS 487.805(2), and of the driver's right to obtain a test of his own, ORS 487.810. In other words, the legislature prescribed that the breath test would be administered only upon the DUII suspect's voluntary and informed choice, subject to the sanction of a license suspension. By declining to breathe into the test device a driver could choose not to risk facing the results in a criminal trial and instead refrain from driving a car for four months.

The arrested driver's choice is no less a choice because one would prefer to avoid either alternative. And the legislature has made clear that it is to be an informed choice. For not only must the officer's report recite that he furnished the required information about the rights and consequences involved; ORS 482.550 provides that these procedural steps and recitals could be controverted in a hearing on the resulting license suspension.[6] More than that: Compliance with the procedure of warning and informed choice is made subject to a highly unusual "appeal" in a *de novo* jury trial in circuit court "as provided in criminal actions" before the license suspension takes effect. ORS 482.560.

In view of these defenses available in the license suspension procedures on the one hand, and on the

---

[6] ORS 482.550(1) provides for an adjudicatory hearing and findings. Subsection (2) provides:

"The scope of the hearing shall be limited to:

"(a) Whether the person at the time he was requested to submit to a test was under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 487.540 or of a municipal ordinance;

"(b) Whether the police officer had reasonable grounds to believe, at the time the request was made, that the person refusing to submit to the test had been driving under the influence of intoxicants in violation of ORS 487.540 or of a municipal ordinance;

"(c) Whether the person refused to submit to a test;

"(d) Whether such person was informed of the consequences, under ORS 482.540 to 482.560, of his refusal to submit to the test; and

"(e) Whether such person was informed of his rights as provided in ORS 487.810."

other hand the procedural protections and the potential sentences in a DUII trial, *see Brown v. Multnomah County Dist. Ct., supra,* (including possible challenges to the test procedures and results, *see* ORS 487.815),[7] the choice demanded of the motorist in custody is by no means the simple alternative: "Breathe into the device and chance the results in a DUII trial or take a 120-day license suspension." The legal consequences of the choice are neither obvious nor easy to evaluate in the individual case. Indeed these legal consequences change with the passage of new legislation, as in 1979.[8] There may be collateral effects for the individual's overall driving record, insurance coverage, even employment. Commonly an arrested person will know little of these implications of the decision to take or to refuse the test. But she may recognize, as Mrs. Scharf did, that it is a decisive moment for the subsequent legal consequences and want to call counsel for advice before making the decision.

In the state's view, the informed choice is to be confined to the limited information recited by the police. But it would contradict the legislature's concern with assuring the arrested driver a voluntary and informed choice to assume that it meant to force him or her to depend solely on police advice. The most conscientious officer cannot in good conscience do more than recite the 120-day suspension sanction and the suspect's right to have an independent test performed at her own expense. ORS 487.805(2)(d),(e), 487.810. Even if an officer were more intent on explaining the alternatives than on getting assent, he

---

[7] An uncounseled lay person is in no position to assess possible challenges to the test procedure or to the reliability of the test itself. *See, e.g.,* Comment, *Breath Alcohol Analysis: Can It Withstand Modern Scientific Scrutiny?,* 5 North Ky L Rev 207 (1978).

[8] Oregon Laws 1979, ch 822, amended ORS 487.805 to allow evidence of refusal to take a breath test (or other chemical tests under ORS 487.835) to be admitted in civil or criminal proceedings, thus further complicating the legal considerations that bear upon the arrested person's choice to take or decline the breath test.

could not give advice tailored to the arrested person's circumstances.

In no other context do we expect a person in custody on a criminal charge to rely for legal advice on those who intend to prosecute her. To the contrary, in view of the long established and well-known right of any arrested person to call an attorney, there is no reason to believe that the legislature meant to exclude from that right one critical stage, and this the very stage that the legislature expressly required to be voluntary and informed. The exact opposite is the logical implication of that legislative policy.

The state's position would produce a wholly incongruous result. At the time of arrest, the motorist is told that she may consult an attorney. If she is later prosecuted, she is entitled to legal representation. ORS 135.050, *Brown v. Multnomah County Dist. Ct., supra.* Only at one point between the beginning and the end of the criminal process the state insists on interrupting her access to her attorney. That is at the point when the police call upon her to choose whether to provide evidence to be used against her on the very charge on which counsel is later to defend her. And this choice, as the legislature wants her to know, is voluntary and has important legal consequences. Counsel upon arrest and counsel at trial, but never counsel at the moment of the decisive choice. The logic of such a rule would have seemed familiar to Alice from the trial in Wonderland.[9] But there is no reason to think that the legislature contemplated any such rule when it enacted ORS 487.805.

Because the legislature decided to employ breath tests in DUII prosecutions only with the suspect's informed assent, it follows that the results of such a breath test are to be used against a DUII defendant

---

[9] *Cf.* The Queen's explanation to Alice:

"The rule is, jam tomorrow and jam yesterday—but never jam today." L. Carroll, Through the Looking Glass 209 (Grosset & Dunlap, 1946).

only when they have been obtained by legally proper procedures. This court held as much in *State v. Fogle,* 254 Or 268, 459 P2d 873 (1969). There the breathalizer procedure was invalidated for failure to show that the equipment was properly tested as required by law. Though the breath test results might nevertheless have been accurate, their use against the defendant was denied as inconsistent with the statute. The identical principle applies once it is established that denial of the normal right to consult one's attorney is inconsistent with the legislative decision that the breath test is to be administered only upon the arrested person's voluntary and informed choice.[10] Indeed, the state's brief does not argue otherwise. It seeks to defend only the practice of denying the accused access to counsel before choosing to take or refuse the breath test. The state does not maintain that if this practice is improper, the test results may nevertheless be used.

In sum, what is in dispute in this case is only the propriety of a deliberate practice to deny arrested persons the right to call a lawyer before deciding

---

[10] The Court of Appeals, though denying certain claims of procedural impropriety, has assumed that such improprieties would lead to exclusion of evidence of chemical blood tests. *See, e.g., State v. Freymuller,* 26 Or App 411, 552 P2d 867 (1976); *State v. Osburn,* 13 Or App 92, 508 P2d 837 (1973); *State v. Annen,* 12 Or App 203, 504 P2d 1400 (1973); *State v. Greenough,* 7 Or App 520, 491 P2d 630 (1971).

Decisions on admitting or excluding improperly obtained evidence are not instances of a single "exclusionary rule." Rather, they depend on whether the premise of the impropriety was a law addressed to the manner of obtaining or using the evidence or a law protecting some unrelated interest. *See State v. Valdez, supra; State v. Fairley,* 282 Or 689, 580 P2d 179 (1978), *and cf. State v. Haynes, supra; State v. Jones,* 279 Or 55, 60, 566 P2d 867 (1977). Thus cases like *State v. Valentine/Darroch,* 264 Or 54, 504 P2d 84 (1972), are not in point. There defendants claimed that the police had failed to comply with a statute requiring an officer to give notice of his authority and purpose before forcing entry into a dwelling, and the court held that the statutory violation, if proved, would not compel suppression of the resulting evidence. Unlike that statute, ORS 487.805 is plainly and solely directed to the manner of obtaining breath test evidence in DUII cases, and a finding that defendant was improperly constrained in making the statutory choice necessarily vitiates the test. *Cf., e.g., Benanti v. United States,* 355 US 96, 78 S Ct 155, 2 L Ed 2d 126 (1957) (excluding evidence obtained in violation of wiretapping law).

whether or not to give the police evidence on the criminal charge on which the person is arrested. As set out above, there is no legal authority for this practice. It contradicts the legislative decision to make use of the breathalizer test depend upon the arrested motorist's informed choice.

When a state has been as sensitive as Oregon has been to safeguard the access of a person in police custody to outside counsel, it would be inexplicable to create an exception in this of all cases—in a situation where the law deliberately has given the arrested person a choice between two very different procedures and potential sanctions. Since Mrs. Scharf was denied such access in pursuit of an improper practice and not because of any practical obstacles, it follows that the results of the test should not have been used in evidence against her, and her conviction on that evidence must be set aside.

Reversed and remanded.

**DENECKE, C. J.,** dissenting.

The majority holds that the informed consent statute requires that a person requested to take a breathalyzer test be given the opportunity to obtain the advice of counsel before deciding whether to take the test. The statute does not expressly so require. In my opinion the statute impliedly does not so require; the most reasonable interpretation of the statute is exactly to the contrary.

The first Oregon law relating to testing those arrested for drunken driving provided that the officer could not test the arrested person if such person objected. Oregon Laws 1941, ch 430. At this time there was considerable doubt whether the arrested person could be compelled to take the test. 51 Mich L Rev 1195 (1953). Probably that is why the Oregon law was

initially written so that a person could not be tested if he or she objected.

Voluntary testing was unsatisfactory and states began to experiment with laws providing that by using the highways the driver consented to be tested. The validity of such laws continued to be dubious and, therefore, the legislature added provisions that the person could refuse and such refusal could not be introduced into evidence at the criminal trial. However, the person's driver's license could be suspended if he or she refused. 88 ALR2d 1064-1066 (1963). Oregon enacted such laws. Oregon Laws 1965, ch 574. This is basically the statute applicable to this case.

In 1979 the Oregon Legislature decided that it would not cause the implied consent law to be invalid if it amended that law to provide that evidence of the driver's refusal to take the test would be admissible in civil and criminal proceedings. Oregon Laws 1979, ch 822.

The legislature has repeatedly evidenced serious concern about the problem of driving while under the influence of liquor. It has strengthened the enforcement of laws relating to driving while under the influence by amendments which changing consti- tutional law seemed to permit. In light of this history of repeated changes in the law in favor of stronger enforcement, I cannot read an implied legislative intent to require the opportunity for legal advice which certainly would not strengthen enforcement.

The statute expressly provides that the officer may inform the arrested person of his or her choices. ORS 487.805(2). In view of this express provision for the officer informing the arrested person of his or her choices and the consequences of the choices, I do not believe it reasonable to infer that the legislature also intended to legislate that the arrested person is entitled to additional advice from a lawyer. The subject of advice was expressly provided for; if the legisla-

ture had intended to provide additional advice, the normal procedure would be to expressly so provide.

The majority finds a legislative "concern with assuring the arrested driver a voluntary and informed choice." From this the majority reasons that the decision to take or refuse the test must be "informed." And then the majority concludes that from this premise, "informed" must mean with the assistance of counsel. In my opinion a statement of the argument is sufficient to reveal its deficiencies.

The majority also holds that the breathalyzer test results must be excluded from evidence because the officer did not comply with an implied provision of the statute requiring the officer to permit the arrested person to obtain legal advice. In my opinion this is contrary to our decision in *State v. Valentine/Darroch,* 264 Or 54, 66-69, 504 P2d 84 (1972). We there held that evidence would not be excluded because it was obtained in violation of a statute.

The majority is of the opinion that *Valentine/Darroch* is not in point but the issue in this case is identical to that in *State v. Fogle,* 254 Or 268, 459 P2d 873 (1969), in which we did exclude the evidence.

In my opinion *State v. Fogle* is not in point. ORS 487.815 (at the time of *Fogle,* ORS 483.644) provides:

"(1)  Chemical analyses of the person's breath, blood, urine or saliva, to be valid under ORS 487.545, shall be performed according to methods approved by the Health Division and by an individual possessing a valid permit to perform such analyses issued by the Health Division.

"(2)  The Health Division shall:
"* * * * *.

"(c)  Test and certify the accuracy of equipment to be used by police officers for chemical analyses of a person's breath before regular use of such equipment and periodically thereafter at intervals of not more than 60 days, such tests and certification to be conducted by trained technicians.
"* * * * *."

[464]

This statute expressly provides that breathalyzer results are not "valid" unless the equipment is initially tested.

In *Fogle* there was no evidence of any test being made of the equipment. Therefore, we held that the result of the breath test was not admissible. We held that if the test was not "valid" the legislature clearly intended that the breath test would be incompetent evidence and, therefore, inadmissible.

ORS 487.815, pursuant to which *Fogle* was decided, has no application to this case. ORS 487.805, the statute applicable in this case, does not require even that the officer inform the arrested person of his or her choices. Subsection (2) provides that before one's driver's license can be suspended for refusal to take the test, the officer must inform the defendant of his choices and the consequences of his choice.

In *State v. Osburn,* 13 Or App 92, 96, 508 P2d 837, 839 (1973), the Court of Appeals held:

> "We disagree with defendant's interpretation of the controlling statutes.They do not explicitly require police officers to inform an arrested driver of anything. Instead, ORS 483.634(2) and ORS 482.550(2), read together, provide only that the Motor Vehicles Division cannot suspend a person's driver's license for refusing to take a breath test unless he has been advised of the required rights and consequences. Accordingly, failure of the arresting officer to do so only bars administrative license suspension for refusing to take the test, make the results thereof inadmissible in a criminal trial." (Footnote omitted.)

In my opinion this is a reasonable interpretation of the statute. On the other hand, it does not appear reasonable to conclude that when the legislature expressly provides that the effect of an officer's failing to advise a person of his or her choices and their consequences is to prohibit the state from suspending his or her license, the legislature, nevertheless, intended that if one is prevented from obtaining a lawy-

er's advice the test results must be excluded from evidence.

Tongue and Howell, JJ., join in this dissent.